## SURPRISE AT SEVERITY OF SENTENCE.

[Common Pleas Court of Lucas County.]

THE STATE OF OHIO v. THE HYGEIA ICE COMPANY ET AL.

Decided, August 4, 1906.

*Constitutional Law—Penal Clause of Valentine Anti-Trust Act—Not Invalid for Lack of Uniform Operation—Classification of Persons and Corporations—Criminal Procedure—Misleading Defendants to their Prejudice—Mistaken Expectation of Leniency—Prosecution of Ice Men—Under the Anti-Trust · Law—Affidavits of Prejudice—Legal Ethics.*

1. The imprisonment or penalty clause of the Valentine Anti-trust law is not in contravention of the constitutional requirement that all laws of a general nature shall have uniform operation throughout the state.

2. What the court said and did during the trial of this case did not mislead the defendants into withdrawing their pleas of not guilty and entering pleas of guilty, or to the taking of other action to ·the prejudice of their rights; they were surprised, not by any wrong or unfair thing which the court did, but by the severity of the sentence imposed; and in the entire absence of any promise or intimation of leniency, the misjudgment of the defendants and of their attorneys as to the attitude of the court with refrence to the nature of the offense committed and the degree of punishment which should be imposed is not ground for vacation of the sentences which were pronounced.

3. The rule safeguarding the rights of a prisoner, which applies to extrajudicial confessions, should not necessarily be applied to a confession made in court; and ·were this not true, it would not follow that it should be applied where intelligent and shrewd business men, flanked by lawyers among the best in the state, have speculated for weeks as to the best thing to do, have consulted with the prosecutor, and after turning the matter over in every possible light, conclude to plead guilty and throw themselves on the mercy of the court.

BABCOCK, J.

The three motions of the several defendants have been heard and will be disposed of together as heard. The vital questions are the same in each. It is true that in Joseph Miller's case a

trial and conviction had already taken place and motions for new trial and in arrest of judgment had been filed, while in the cases of Reuben C. Lemmon and Roland A. Beard, defendants, trials had not taken place, but they were before the court and awaiting trial and had pleaded not guilty to the charge preferred. On June 11th, these defendants withdrew pleas of not guilty and pleaded guilty. Later defendant Miller withdrew both of his motions and awaited sentence. His motion is for vacation of the sentence pronounced upon him with application for reinstatement of the same as they stood before withdrawal, while Lemmon and Beard's motion is for the vacation of the sentences with application for leave to withdraw the pleas of guilty and entering in their stead pleas of not guilty. The grounds of vacating the sentences are so nearly alike that the court can properly make its findings of law and fact on all three motions at the same time.

The movers in all the motions contend for four propositions:

1.  That Section 4427-4 of the Revised Statutes is unconstitutional so far as the imprisonment clause is concerned.

2.  That the court promised leniency to defendants if they would plead guilty, and therefore misled them to their prejudice.

3.  That the court, by words and conduct, misled them into pleading guilty, to the like prejudice of their rights as defendants in the case.

4.  That said defendants were wrongfully induced, and in violation of their rights, were led to withdraw their pleas of not guilty and plead guilty through hope and expectation of leniency excited in their minds by counsel who were laboring under misapprehension and mistake as to leniency of sentence about to be pronounced.

While this grouping is not in the language of the motions, it does cover the grounds contended for.

The first question, then, in the order named, is that of the power to imprison for violation of the said sub-section styled the imprisonment or penalty clause of the so-called Valentine Antitrust law. Sub-section 12 of said act reads;

"The word person or persons, whenever used in this act shall be deemed to include corporations," etc.

It is contended that this act providing for fine and imprison· ment for natural and artificial persons alike, is invalid as being in violation of Article II, Section 26, of the Constitution, which section provides that, "all laws of a general nature shall have a uniform operation throughout the state." It is contended that since corporations can not be imprisoned, natural persons are discriminated against by this imprisonment clause. It is further contended that if a classification may be made, this act is not saved from unconstitutionality, for the reason that the Legislature has not made any such classification.

The court is of opinion that the first contention is without force, for the reason that, were it otherwise, no criminal act could stand which omitted corporations from its provisions. This seems true for the reason that an entire exemption of artificial persons would be as grievous as a partial exemption—in fact, it would be a wider departure from uniformity. A law operates uniformly when it has uniform operation upon all of a particular class, if the classification made is a reasonable one.

It is contended that the Legislature has not attempted any classification, and therefore that the statute can not be saved on the classification theory. The court does not concede the proposition that classification between natural and artificial persons is necessary to meet this constitutional provision; but for the argument's sake assumes the contention of counsel to be correct and is seeking to determine whether classification in fact has not been made. If the court apprehends the claim of counsel, it is that there has been a classification made of natural persons on one side and artificial persons on the other. The complaint is of this classification, yet the fact of classification is denied. But it is said that a classification involves a purpose to classify which is obvious upon the face of the statute, and this plainly. shows that they did not have classification in mind; for it is contended that the Legislature would not have laid a more grievous burden on individuals than they would on corporations which are known to be the class against which the corrective force of this statute is aimed. It appears to the court that this is a beg-

ging of the question; that it is speculative and fanciful; and, finally, that there is nothing in even-handed justice calling for any different penalty upon artificial persons than for natural persons. At least the court feels it is not justified in saying that the Legislature may not have taken this brief manner of classifying by expressing it all in one section of the statute, leaving it to the very nature of the two different kinds of persons to suggest the classification. I am further inclined to believe that when a law operates uniformly on all natural persons within the limits of the state, it operates uniformly.

At a time when the constitutional question is pending in the circuit court and when that question is not plainer than it is in this case, it would be manifestly rash for the court, on this motion, with the consequences involved, to hazard the opinion that this solemn enactment of the Legislature is invalid, and when, as said by the Supreme Court in *Western Union Telegraph Company* v. *Mayer et al*, 28 O. S., 540, that: ''Unless it manifestly contravenes the Constitution, the judicial department is not warranted in declaring it void.''

The second ground for setting aside the sentences is withdrawn from consideration by the movers, who say that they do not claim any promise expressly made by the trial judge and have never intended to be so understood.

The third ground is the claim that the court, by what it said and did, misled the defendants into withdrawing pleas of not guilty and entering pleas of guilty to the prejudice of their rights. This does not involve the question of express promise, but of indiscretion or that which amounts to an implied promise of the court resulting in an injury to the defendants and which fairness and justice requires should be repaired by putting the parties back in the position they were in before. The question is this: Did the trial judge do or say anything to mislead these defendants to their prejudice? If he did the sentences should be set aside. Before taking up in detail the history of what took place leading up to the sentences, I wish to say that I have been struck with the unusual care taken to avoid embarrassing complications. The parties handled each other at arms length. The defendants' counsel were unusually delicate in observing the

ethics of the profession, in avoiding any attempt to either influence the trial judge or solicit favor at his hands.

In May, they sought to bring about a conference with the court through the prosecuting attorney. This is not unusual. The prosecuting attorney is necessarily in close relationship with the trial judge. He declined to take any part in this, and told the parties to speak for themselves. They first concluded to do this, but, on second thought, abandoned it.

On June 6th, the Miller case had reached that stage in which the state had substantially made whatever case it had. It seems that a contract signed by these parties who constituted the Toledo Ice & Coal Company and the Hygeia Ice Company, had been introduced in evidence, and which, unexplained, was very damaging to the defense. It was consequently liable to be an embarrassing thing to these other defendants when their cases were put on trial. From what the trial judge said at the time of sentence as to the powers of the court to accomplish in this class of cases the real ends of justice, it would seem that he conceived this idea, that the defendant Miller was in danger of embarrassing himself and possibly of swearing falsely if he took the witness stand and denied the combination, and that, if there was a combination, it was in the interest of public justice that it be broken up and restitution made of such money as had been extorted from the customers. He realized the delicacy of the position. He must not assume but what Miller had a good defense; neither must he assume that there was any combination, notwithstanding what appeared in the state's proof; he must not do anything that would injure the defendant in the conduct of his case, and at so critical a juncture; yet it apparently seemed to him that he might be of service to public justice and subserve the interests of all parties if the defendants could see their way, in case they were guilty, to obey the law and make some reparation for the wrong. If he safeguarded all these rights, it was proper that this idea should be conveyed to Miller's counsel, Alexander Smith. But it must not be done so as to invade his rights and presumption of innocence with which the accused stood clothed.

The trial judge is uncertain which motive is the strongest with him leading him to do what he did. He says that he had no clear idea as to what could or ought to be done to accomplish the ends of justice; he only wanted Mr. Smith to think about it and left it to his good judgment to act in such way as was consistent with the discharge of his duties. He therefore said to him: "I want to get an idea to you, but I don't want you to commit yourself—you needn't say a word. It might be well, however, to think along these lines"; and when the prosecuting attorney said to Mr. Smith, "What do you think about Miller's guilt?" the court immediately stopped him—as it might wear the complexion of something inquisitorial—and said "Mr. Smith is not here to be asked any questions, to make any statements or admissions." The court was simply attempting to show some way of safety to Mr. Smith, if his client was guilty and in any danger, and he left it to him to do as he wished without exposing his hand to any one.

I think that much that Mr. Smith claims in his affidavit, was, in substance, said. It is admitted that it was in the mind of the trial judge, and he might with entire propriety have expressed it, and it seems to have been along the line of his thought. He thinks, however, he did not say anything further than this: "Mr. Smith, this inquiry has been running through my mind as I have heard the case tried. These men have been indicted by the grand jury, and I have listened to the state's side of the case, and, of course, I don't know anything about what your proof will be. It might completely answer the case of the state—it may not answer it at all. It will have to be a pretty strong case, in my judgment, to answer the case that the state has made. The inquiry has been running through my mind, if this combination was formed as testified to by the witnesses on the part of the state—the inquiry has been running through my mind, why don't they abandon the whole thing, restore conditions; and I have simply called you in to make this inquiry; you can answer it or not, or you can answer it later or not as you wish; but I have thought of whether it might be practicable to bring about this result and I want to say to you that even if it were practicable, I do not wish the inquiry to indicate any line

of action that I might take with reference to the cases even if it were done.''

Smith then said that he wished to talk with his associates before he said anything, and that he might talk with the prosecuting attorney. It was properly suggested that it should be kept secret; and the reason is plain, for if the jury got the idea that there was some talk of surrender on the part of the defendant, it would be most damaging to his defense. The situation was called to the attention of counsel by way of admonition; it was proper, and evidenced an appreciation on the part of the trial judge of the delicacy which the administration of public justice demands at his hands. Mr. Smith thinks and makes affidavit, that the judge went so far as to suggest that none of the indicted parties could or should be allowed to testify; that if they did not testify they would probably be found guilty, and that if they did testify and the jury convicted, there might be a disagreeable necessity for a further inquiry—hinting at an investigation of perjury by the defendants.

I have this to say: That a judge who would so impose upon a defendant or his counsel, should resign his office. But it is so unreasonable and is shown by the context to be so far from the truth, that the court refrains from saying that it is willfully false by the consciousness that Mr. Smith at the time was in that position of uncertainty as to what was best to do, that his mind was in no condition to receive what the court said on the subject of the strength of the state's case, without distorting it and mixing his own impressions with what was said. He feared that his client was in danger of conviction; he was analyzing in his mind whether he could safely put Miller upon the stand, and when the trial judge called his attention to the fact that the state had made a pretty strong case, he received the impression that it was unwise to put his client on the stand and he has confused that with saying that the court admonished him that he must not put him on the stand.

It is unreasonable that a court would guard him against saying anything that might be embarrassing, to stop the prosecuting attorney from even asking him an opinion about the merits of the case, and at the same time prejudge the matter and tell him

that his client must not exercise his constitutional right of testifying in his own defense. I believe that Mr. Smith has confused his fears and what he thought he had better not do with the words of the judge; I prefer this to thinking that he has intentionally sworn false; but that it is false, in words and in spirit, is clearly shown. The judge even took the pains to say that if he acted in any manner upon the suggestions made, he must not consider it as indicating anything the court would do by way of punishment. Smith, of course, communicated this to Brown, who immediately saw that it could lead only to unconditional surrender. Brown knew that he must not attempt to bargain with the court; neither did he have the disposition to wish to do so, for he had before that observed the ethics of the profession to such an extent as to abandon a purpose to even see the judge.

The trial judge, in suggesting this idea to Smith's mind, did that which made it entirely proper for Brown to go and see him, and it was entirely proper that he should seek to find out what he could as to the consequences if they pleaded guilty. I am inclined to say that if he had not done so he would have been remiss in the discharge of his duty to his client. I think that Mr. Brown saw that it was liable to involve restitution to the customers from whom money had been extorted. He naturally wished to yield as little as possible and get as much in return as possible in the way of leniency. He knew that this suggestion came from the judge and not from the prosecutor. He therefore sought to rebuke the suggestion of undoing the wrong by whipping the judge over the prosecutor's shoulders; so he said: ''Why, Wachenheimer can't fix prices; if he attempts that, we will have him indicted for violation of the law.'' And he went on to say that the men were justified in all they had done; that there had been an increase of expenditures and that nobody had done anything that was wrong, and they would show the whole thing to be correct and right when they got to the trial. The judge saw that the attitude of counsel was such that what he had suggested was not liable to be accepted kindly, and that anything further was liable to lead into embarrassment, and he immediately admonished Mr.

Brown that he need not say anything further, and said to him that ''There isn't any occasion for talking about this matter any further,'' and left the room.

Mr. Smith went forward with his defense; and later, very properly, sought to open further conversation along the same line that had been suggested to him by the court at the noon recess. The court's short interview with Mr. Brown had determined and closed the entire incident, and he said to Smith, ''I do not care to discuss this thing any further at all; you may dismiss the whole matter and consider it as if nothing had been said about it.''

This is the entire matter complained of. The conduct of every one in the case indicates that it was considered entirely abandoned. Even the associate counsel of Mr. Brown, who went with the parties into court and withdrew the plea of not guilty and pleaded guilty, says that before the sentence was pronounced he speculated with the prosecutor as to what probably the court would do, in which he suggested that he did not believe the court would impose a workhouse sentence, and that the prosecutor intimated that he wasn't so sure of that—meaning thereby that he was inclined to think they were expecting to get off easier than they were liable to. This is strong, almost conclusive, that there was nothing held out and that the defense did not think there was anything held out in the way of favor to be received; otherwise this conversation is unintelligible.

In a word, the situation was this: The defendants had learned that the court's idea was that if the defendants were guilty, it would be wise to stop the contest and do the proper thing by the way of restoration. They, therefore, within forty-eight hours before entering the plea of guilty, made a deduction of two dollars a ton to home consumers, threw themselves upon the mercy of the court and hoped for some leniency. They were not surprised by anything the court did unfairly; they were surprised at the court's severity. It was not that he had done some wrong, but that he had enforced the law with vigor and apparently with the intention to cut up root and branch the unlawful combination. They were chagrined that they had wrongfully anticipated the outcome. They should not have attacked the

court as they did. I wish, however, to say in this con-
nection, that the counsel who were called in this emergency
have acted in a manner entirely commendable in so far as the
court can observe, and that in filing the charge made in the
motion they might properly feel that they needed to ·character-
ize the conduct as a promise, lest otherwise it might be held
that the grounds upon which they were claiming that the sen-
tence should be set aside were not sufficient. I prefer to believe,
and do believe, that it was filed under a belief that it· was a
proper thing for them to say and do, under the information
they had, but I add that this information was entirely without
foundation.

This principle is contended for, that it makes no difference
who excited the hope or expectation in the minds of the prisoners
of leniency, in case of pleading guilty, if the court shall find
that they did have that expectation and were thereby led to
withdraw their plea of not guilty and enter a plea of guilty.
It is based upon the familiar doctrine that an extra-judi-
cial confession will not be received in evidence in a crim-
inal case, unless it is voluntarily made; and counsel con-
tend, with a good deal of show of plausibility, that if a
partial confession of guilt, induced by hope or fear ex-
cited in the mind of the prisoner by any one, is not to be
considered as voluntary, then the confession in open court, in-
duced by hope of leniency excited in the mind of the prisoner
by anyone, ought to be equally protected. In case of an extra-
judicial confession thus brought about, the ruling is that it shall
not be received in evidence. The contention is that the same
principle ought to obtain and the pleas of guilty which have been
entered ought to be withdrawn. The rule as to extra-judicial
confessions is exhaustively treated in *Spears v. State*, 2 O. S.,
583, wherein the court says:

"The judge is to determine how the confession was produced
by looking at the circumstances, among which are the strength
or weakness of the prisoner's intellect, his knowledge or igno-
rance. If satisfied that the confession was produced by represen-
tations or threats, the court can not receive it in evidence.
* * * The strongest mind is liable to be unhinged, and

the question is not what the prisoner ought to have believed, but what did he believe."

It does not follow that the same rule safeguarding the prisoner's rights which applies to an extra-judicial confession should be employed in the case of a confession in court; in fact, the rule is otherwise. But, if it did apply, what would the court say in this case, under the rule which says that the court should look to the circumstances, the strength or weakness of the prisoner's intellect, his knowledge or ignorance? When one is suddenly accused of crime, taken into custody, threatened with the opening of prison doors, the heralding of the offense in all ears, the blasting of reputation, the court properly says: "In such instances the strongest mind is liable to be unhinged." Justice requires that a party thus circumstanced should be safeguarded, for he will catch at anything which looks like hope. Human nature is such that many times persons have been persuaded to plead guilty to things they were innocent of, for the apparent temporary rescue of themselves. Here intelligent, shrewd business men, flanked by great lawyers of the state, speculated for weeks as to what was the best thing to do; sought interviews with the prosecutor in season and out of season; went over the whole matter time and again, turned it over in every possible light and finally concluded to plead guilty and throw themselves upon the mercy of the court. It would be a strange doctrine if the rule safeguarding their rights should be that of one suddenly overwhelmed and in fright at the arrest and charge of crime.

The rule is universal that a person who has been indicted and who has pleaded not guilty may by leave of the court, on the advice of counsel or of his own motion, withdraw that plea and enter a plea of guilty; but it has long been held that where a defendant has pleaded guilty and sentence has been passed upon him, he can not retract his plea and plead not guilty. The English case announcing that a prisoner will not be permitted thus to do, is *Regina* v. *Tell*, 9 Car. & P., 346. The same doctrine is announced in *State* v. *Buck*, 59 Ia., 382; *Mastrodama* v. *State*, 60 Miss., 86. I call attention to the statement of the law as

made by eminent text-writers in criminal law. Says Bishop, in the New Criminal Procedure, Vol. 1, Sec. 789:

"In most of our courts, where leave to substitute not guilty is asked in a reasonable time, it is granted pretty nearly as of course. Even where, after a defendant has pleaded guilty, has moved an arrest of judgment and his motion has been overruled, the court, if justice requires, will allow a substitute of not guilty for guilty, but it is too late after sentence."

To the same effect is Wharton's Crim. Pl. & Pr., Sec. 441. It would be to trifle with courts of justice to permit parties to speculate on what the sentence will be, and when it is not satisfactory to say, "What I did was not voluntary, because I expected leniency, which I failed to receive."

Concerning the severity of this sentence and its wisdom I have nothing to suggest: First, because it is not within my province; second, because it would be discourteous to the judge who pronounced it. With its suspension or modification I have nothing to do.

It is therefore adjudged that each and every of the three motions be overruled.

*L. W. Wachenheimer*, Prosecuting Attorney, *Ralph Emery*, Assistant Prosecuting Attorney, *Henry W. Seney*, for the State.

*King & Tracy, Brown, Geddes, Schmettau & Williams, Smith & Beckwith*, and *Hamilton & Kirby*, for defendants.